UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICIA KAYE EWALT,

    Plaintiff,                                      Case No. 08-10571
                                                 HONORABLE SEAN F. COX

v.

ACUMENT GLOBAL
TECHNOLOGIES, a Delaware
corporation,

    Defendant.
_____/

## OPINION & ORDER

Plaintiff Patricia Kaye Ewalt ("Ewalt") filed this gender and FMLA discrimination claim against her former employer, Acument Global Technologies ("Acument") on February 7, 2008. The matter is currently before the Court on Acument's "Motion for Summary Judgment" [Doc. No. 15]. Acument alleges Ewalt cannot meet her burden under the familiar tripartite burden-shifting procedure set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The parties have fully briefed the issues, and a hearing was held on April 16, 2009. For the reasons below, the Court **GRANTS** Acument's motion [Doc. No. 15].

## BACKGROUND

Ewalt worked at a manufacturing facility in Jackson, Michigan ("the Jackson facility") for approximately ten years while the facility was owned by another company. [Ewalt Dep., Def.'s Ex. A, p.11]. In 2007, the Jackson facility was purchased by Acument. *Id*. At the time of her termination, Ewalt was one of four managers at the Jackson facility, holding the position of

1

Materials Manager.  As will be explained below, Ewalt's alleged penchant for the use of foul language and sexual innuendos, coupled with the perception she was demeaning and condescending to hourly employees at the Jackson facility, was a motivating factor behind the hourly employees at the Jackson facility seeking union representation in late 2007.  When upper-level management learned these issues were part of the impetus for the union drive, management terminated both Ewalt and the Jackson facility's Plant Manager, Don Petitjean.

Ewalt's Surgery, Rehabilitation, and Eventual FMLA Leave

Ewalt had surgery on her foot in July of 2007. [Ewalt Dep., p.21].  Beginning in September of 2007, Ewalt required physical therapy in connection with that surgery, and would leave work approximately fifty to ninety minutes early three days per week to attend these sessions.  *Id*. at 22-23.  After several months of therapy, Ewalt spoke with the HR Manager at the Jackson facility, Linda Frye ("Frye"), about her continuing therapy.  *Id*. at 32.  Frye suggested that, though Ewalt's physical therapy needs had not been questioned by management thus far, Ewalt should still consider applying for FMLA leave to obtain the protections such status afforded.  *Id*. at 29.

At that time, Acument coordinated its FMLA leave through MetLife.  On December 13, 2007, MetLife sent an email to Frye approving Ewalt's intermittent FMLA leave, allowing for one day of leave per month beginning February 1, 2008. [*See* FMLA Award Letter, Def.'s Ex. F]. Though Frye received this information, and forwarded it along to Ewalt, Ewalt has proffered no evidence that Frye informed Acument's senior management of Ewalt's FMLA status. [Frye Dep., Def.'s Ex. G, p.13].

<u>Alleged Behavioral Issues by the Jackson Facility Managers</u>

The Jackson facility had a culture where the use of foul language by its employees was tolerated to a certain extent. It is alleged, however, that Ewalt was one of the most flagrant offenders in the Jackson facility, often swearing or using sexual innuendos around other employees. Such behavior by Ewalt was partly to blame for the hourly employees at the Jackson facility eventually seeking union representation.

While he was the HR Manager at the Jackson facility[1], David Schollhammer ("Schollhammer") had previously counseled Ewalt about her use of abusive language. [Schollhammer Dep., Def.'s Ex B, pp.20-21]. Ewalt was also counseled about her language by Don Petitjean. [Petitjean Dep., Def.'s Ex. C, p.10]. While the Jackson facility did have a culture embracing the use of occasional foul language, Mark Johnson, the Controller for Acument, testified that Ewalt was known as one of the most flagrant offenders. [Johnson Dep., Def.'s Ex. D, p.11].

According to numerous Jackson facility employees, Ewalt had a penchant for "the frequent use of the wor[d] 'fuck.'" [Def.'s Br., p.3]. John Mahoney, Regional Human Resource Manager at Acument, performed an investigation into the cause for the union drive at the behest of Schollhammer. In his deposition [Def.'s Ex. E], Mahoney relayed one particular incident he was made aware of by an hourly employee:

> Kaye [Ewalt] had gone in [to the office of Marie DuBose] to see Don Petitjean, who happened to be there looking at some files, and when [*sic*] into a tirade of F words with Don in a discussion of a customer. Marie immediately went to her

---

[1] Schollhammer was later promoted to Director of Human Resources at Acument. Schollhammer was also the individual who spearheaded the inquiry into the cause for the union drive at the Jackson facility, and the individual responsible for terminating Ewalt and Petitjean.

3

> leader, which was Emily Reese, and related that that had happened and she was not happy about it.

[Mahoney Dep., p.19]. Mahoney also testified that "other individuals had indicated that Kaye had a tendency in meetings out in to open. . .to continue to use this type of language, along with . . .sexual innuendos." *Id*. For instance, hourly employee Mark Silvey discussed with Mahoney how Ewalt would often make comments about "charging her batteries," which Silvey felt Ewalt meant as a sexual innuendo. [Mahoney Dep., pp.19-20].

Another such incident, which Ewalt admitted occurred [Ewalt Dep., p.40], involved a morning production meeting, at which Ewalt would speak to the hourly workers under her control. At this particular meeting, Ewalt noted that Don Petitjean wasn't present that morning due to an appointment with a sperm bank. Another employee, Jack Crowe, was absent that day as well, and Ewalt repeatedly referred to the event as "jack off day" in front of hourly employees. [Mahoney Dep., p.18; Ewalt Dep., p.40; Schollhammer Dep., p.12].

In yet another incident relayed to Acument management by the hourly employees, one employee discussed how the heater in his vehicle, which was used on the job to deliver parts to customers, had broken down:

> My heater was out in the truck. It's 18 degrees outside or whatever the temperature was. I asked her [Ewalt] to fix it, because I needed heat in the vehicle, and she just said, 'Oh, stop being a pussy.'

[Schollhammer Dep., p.17].

Ewalt also testified in her deposition regarding what she perceived to be the lax work ethic of another manager at the Jackson facility, Mr. Jim Terry.[2] Terry was the Quality Manager

---

[2] Ewalt raises these facts in an attempt to classify Terry as a "similarly situated individual" for purposes of her gender discrimination suit.

at the Jackson facility until he retired in early 2008. Ewalt claimed Terry was treated differently than Ewalt, arguing that Terry did not have to open or close the plant, and was not on a set schedule. *Id*. at 57].³ Ewalt also alleges that Terry was allowed to "sit and play on the Internet all day long. . . ." *Id*. at 63. Ewalt also argues that Terry had previously made offensive sexual remarks without being terminated.

In the summer of 2005, Terry was overheard by several female hourly employees stating that a customer whose order had been mishandled by Acument would agree to still take delivery "in exchange for six sexual favors" from those same female hourly employees. *Id*. at 61; *see also* Schollhammer's June 23, 2005 Investigation Memo, Def.'s Ex. H. As Terry admitted to making the statement and showed remorse, coupled with the fact that none of the female hourly employees involved took the event seriously and that the event was seen as a one-time, out-of-character gaffe by Terry, Acument allowed Terry to keep his job. [Ex. H, p.3]. Acument still, however, suspended Terry without pay for a two week period, and forced Terry to sign a last-chance agreement. *Id*.

<u>The Jackson Facility's Union Drive, and Ewalt's and Petitjean's Termination</u>

Schollhammer received an email on December 12, 2007 that the Teamsters had filed a petition to organize the hourly workers at the Jackson facility. [Schollhammer Dep., p.7]. Though he was at that time serving as Acument's Director of Human Resources for their North American Business Unit, Schollhammer had previously been the Regional HR Manager assigned to the Jackson facility, and felt he had a good working relationship with the Jackson facility's

---

³Ewalt also testified, however, that the plant was only open from 7:00 a.m. until 3:30 p.m., that Ewalt herself worked typical business hours from 8:00 a.m. until 4:30 or 5:00 p.m., and Terry typically worked from 7:00 a.m. until 4:30 p.m. [Ewalt Dep., pp.17, 47, 57]. .

hourly workers.

Based upon that email, Schollhammer counseled the managerial employees at the Jackson facility to avoid contact with the hourly employees on the subject of the pending union drive, stating that "[w]e need to do all the right things so that we can avoid any type of potential NLRB charge." *Id*. However, Schollhammer himself felt that the hourly employees trusted him, and so on December 14, 2007 visited the Jackson facility and spoke with several hourly employees about their reasons for filing a union drive petition.

Schollhammer spoke with Mark Silvey, one of the hourly employees at the Jackson facility, who informed Schollhammer that Ewalt and Petitjean were the reason for the union drive. [Schollhammer Dep., p.11]. Silvey related that many of the hourly employees felt they did not have a voice with the current management, and that they needed a third party to intervene. *Id*. at 13. Silvey also stated that Ewalt was viewed by the hourly employees as demeaning and condescending, and used inappropriate language in their presence. *Id*. at 12. Hourly worker Emily Reese, as well as several other hourly employees Schollhammer spoke to on December 14, 2007, reiterated Silvey's concerns regarding Ewalt and Petitjean. *Id*. at pp.16-18. Schollhammer also confirmed through Silvey that, absent Ewalt and Petitjean, Silvey didn't see any reason for unionization being necessary:

> I stated, "in your opinion - - this is just your opinion, because I'm here to try to understand why they're unionizing - - what would it take for people not to unionize at the facility," and he said, "It's real simple. If Don [Petitjean] and Kaye [Ewalt] were gone, end of story. There'd be no reason for us to unionize."

*Id*. at 13.

Based upon his preliminary investigation, Schollhammer had one of his human resource

employees, Regional HR Manager John Mahoney, conduct a more thorough investigation into the allegations made by the hourly employees against Ewalt and Petitjean. [Mahoney Dep., p.14]. Mahoney arrived at the Jackson facility on December 18, 2007 to investigate, and was immediately met at the door by two hourly employees, Christine Taylor (who was in tears) and Michelle Weeks, with the following situation:

> She [Taylor] explained to me that there was another employee that was not feeling well...Kaye [Ewalt] arrived on the spot and [rather than asking if she could help] began scolding both employees for being together...

[Mahoney Dep., p.16].

Through other discussions with employees, Mahoney confirmed that Ewalt frequently used inappropriate language and sexual innuendos in the presence of hourly employees, *Id*. at 19, and that Ewalt's overbearing management style and unprofessional behavior had contributed in large part to the overall atmosphere at the plant which led to the petition for union election. *Id*. at 15-16. Mahoney also heard accounts of the above-described inappropriate comments made by Ewalt, including Ewalt's penchant for the use of the word "fuck," her comment regarding "jack off day," her comment to Silvey about "charging her batteries," and her statement that an hourly employee was "a pussy" for asking management to fix the heater in his truck. Mahoney then relayed his findings to Schollhammer. Mahoney further testified that the first time he was aware of Ewalt's pending FMLA leave was on December 19, 2007, after Ewalt had been terminated from her employment at Acument. *Id*. at 38-39.

Based upon Mahoney's confirmation of Schollhammer's initial reaction to the union drive petition, Schollhammer made the decision to terminate both Ewalt and Petitjean. Schollhammer testified that the decision to terminate Ewalt was made by him alone

7

[Schollhammer Dep., p.35], and this was confirmed by Mahoney [Mahoney Dep. at 12]. Like Mahoney, Schollhammer testified that the first time he was made aware of Ewalt's pending FMLA leave was after she had been terminated. [Schollhammer Dep., p.35].

Mahoney and Schollhammer both went to the Jackson facility on December 19, 2007. Mahoney and Schollhammer met that morning with Petitjean, at which time Petitjean was terminated. Schollhammer then left the facility, and Mahoney alone conducted the termination of Ewalt. [Mahoney Dep., pp.53-54]. At the end of the termination meeting between Ewalt and Mahoney, Mahoney testified that Ewalt brought the FMLA issue to senior management's attention for the first time. *Id*. at pp.38-39.

Procedural History of the Instant Cause of Action

Ewalt filed this federal question cause of action on February 7, 2008. [*See* Pl.'s Complaint, Doc. No. 1]. Ewalt alleges that Acument terminated her in retaliation for her decision to request intermittent leave pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*. [Count I]. Ewalt also, under this Court's supplemental jurisdiction over related state-law claims, brings a gender discrimination claim under Michigan's Elliott Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2201 *et seq*. [Count II].

Acument filed the instant Motion for Summary Judgment [Doc. No. 15] on December 2, 2008. In their motion, Acument alleges that Ewalt cannot establish a *prima facie* case supporting either of her causes of action. Acument further argues that Ewalt cannot rebut Acument's legitimate, nondiscriminatory reasons for terminating Ewalt. [*See* Def.'s Br., p.18].

STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

## ANALYSIS

Ewalt's claims under both the FMLA and the ELCRA are each analyzed under the ubiquitous burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (FMLA suits analyzed under *McDonnell Douglas*); *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462-63 (2001) (ELCRA suits analyzed under *McDonald Douglas*). In the first step, Ewalt must establish a *prima facie* case. If Ewalt meets that burden, the burden of production shifts to Acument to proffer a legitimate, nondiscriminatory rationale for discharging Ewalt from employment. The burden then shifts back to Ewalt to establish that Acument's proffered reasons are merely a pretext to discriminate. *See Edgar* at 508. "Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007).

With respect to both causes of action, Ewalt is unable to meet her burden of proffering a *prima facie* case of discrimination. Even assuming Ewalt could proffer *prima facie* causes of action against Acument, however, Ewalt's claims would still fail due to Ewalt's inability to show Acument's legitimate, nondiscriminatory reasons for terminating Ewalt were a pretext to discriminate.

### I. Ewalt Cannot Establish a Causal Nexus between her FMLA Leave and her Termination.

Ewalt argues that Acument terminated her employment in retaliation for Ewalt exercising her right to medical leave under the FMLA. The Sixth Circuit recognizes "two distinct theories of recovery for violations of the FMLA: (1) the so-called 'entitlement' or 'interference' theory stemming from 29 U.S.C. § 2615(a)(1). . .and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2007). Both parties concede that Ewalt's claim falls within the "retaliation" theory of FMLA recovery. [*See* Pl.'s Br., Doc. No. 19, p.14; Def.'s Br., Doc. No. 15, p.8].

Under the "retaliation" theory of FMLA liability, a plaintiff must make a three-fold showing to satisfy his or her requirement to proffer a *prima facie* case: 1) that the plaintiff was engaged in a statutorily protected activity; 2) that the plaintiff suffered an adverse employment action; and 3) a causal connection between the protected activity and the adverse employment action. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). Acument does not dispute that the first two elements are met, but argues that Ewalt cannot show a causal link between her exercise of her FMLA leave rights and her termination by Acument. [Def.'s Br. at 9].

Ewalt makes two arguments to establish the existence of a causal link between her FMLA

10

leave and her termination: 1) A single comment made by Linda Frye; and 2) the temporal proximity between her request for FMLA leave being granted on December 13, 2007, and her termination on December 19, 2007. Neither of these arguments is sufficient to establish the required causal link. Further, Ewalt has proffered no evidence that either Schollhammer or Mahoney, the only two managers involved in Ewalt's termination, even knew Ewalt had requested FMLA leave before they decided to terminate her. For these reasons, Ewalt cannot establish the causal link required under *Bryson*, and summary judgment on Ewalt's FMLA cause of action [Count I] is therefore **GRANTED**.

At Ewalt's first meeting with Linda Frye regarding potential FMLA leave, Ewalt expressed her concern that Acument's senior management could grow weary of Ewalt's need to periodically leave work early for physical therapy sessions. Ewalt states that Frye told her there really was no detrimental action Acument senior management could take against her for leaving work early, but that Ewalt should consider applying for FMLA anyways because "you never know what they [presumably, management] might do to you." [Ewalt Dep., p.29].

This was merely an isolated comment made by an individual unconnected with Ewalt's termination. Frye testified that she was not directly involved in the decision to terminate Ewalt, nor was Frye consulted by either Schollhammer or Mahoney in their decision to terminate Ewalt. As such, Frye's alleged comment, even if believed to be true, does not establish a causal connection between Ewalt's FMLA leave and her eventual termination.

Ewalt also argues that the close proximity in time between her request for FMLA leave being granted on December 13, 2007, and her termination on December 19, 2007, demonstrates a the required causal connection required to satisfy prong one of the *McDonnell Douglas* analysis.

The Sixth Circuit, however, has held that temporal proximity alone is insufficient to meet the causal nexus requirement for a *prima facie* FMLA discrimination cause of action. *See, e.g., Ngyyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000) ("temporal proximity alone will not support an inference of retaliatory discrimination where there is no other compelling evidence").

Finally, Ewalt's inability to show that either Schollhammer or Mahoney even knew about Ewalt's upcoming FMLA leave evidences a failure by her to establish a *prima facie* case:

> In order to establish a causal link, Plaintiff must establish that his employer had knowledge of the protected activity when it made the decision to discharge him; without knowledge of the protected activity, there can be no inference that the adverse action was taken because of the protected activity.

*Smith v. ACO, Inc.*, 368 F. Supp. 2d 721, 732 (E.D. Mich. 2005); *see also Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 463 (6th Cir. 2001) (prima facie case of retaliation requires a showing that employer was aware of the protected activity).

Ewalt has failed to bring forth evidence showing that either Schollhammer or Mahoney, at the time the two made the decision to terminate Ewalt, knew she was going on FMLA leave in February 2008. This is insufficient to sustain Ewalt's *prima facie* case for FMLA discrimination, and as such summary judgment is **GRANTED** for Acument on Count I.

    II. <u>Ewalt Cannot Establish She was Treated Less Favorably Than a Similarly-Situated Male Employee,</u>

Ewalt argues that Acument engaged in gender discrimination against her due to Ewalt being treated less favorably than similarly-situated male employees. To state a claim for gender discrimination under Michigan law, a plaintiff must make a four-fold showing to satisfy his or her requirement to proffer a *prima facie* case: 1) that the plaintiff was a member of the protected

class; 2) that the plaintiff suffered an adverse employment action; 3) that plaintiff was qualified for the position; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. *Sniecinski v. Blue Cross Blue Shield of Michigan*, 469 Mich. 124, 134 (2003). "Circumstances give rise to an inference of discrimination when the plaintiff was treated differently than other persons of a different class for the same or similar conduct." *Wilcoxon v. Minnesota Mining & Manuf. Co.*, 235 Mich. App. 347, 361 (1999).

Acument does not dispute that Plaintiff can establish the first three elements, but argues that Ewalt cannot show that she was treated differently than a similarly-situated employee. [Def.'s Br. at 13]. Ewalt argues that she was treated differently than Jim Terry, another manager at the Jackson facility who had previously engaged in inappropriate conduct.

Terry was not similarly-situated to Ewalt for purposes of Ewalt's gender discrimination claim. To establish a gender discrimination claim, Ewalt must "show that the comparables are similarly-situated in all respects." *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992). This means that Ewalt and Terry would need to have "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct *without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it*." *Id*. (emphasis added), citing *Mazzella v. RCA Global Comm.*, 642 F. Supp. 1531 (S.D.N.Y. 1986).

Numerous factors explain Acument's purported disparate treatment of Ewalt compared to Terry. First, it was determined that Terry's comment regarding "six sexual favors" was a one-time gaffe on Terry's part, as opposed to the ongoing pattern of behavior Ewalt exhibited despite

13

being repeatedly counseled about her abusive language. Second, Ewalt herself admitted that Terry was given a lesser punishment not because he was a male, but rather because he was nearing retirement age. [*See* Ewalt Dep., pp.58, 64]. Finally, and most importantly, Terry's comments were not perceived by Acument management to be the impetus behind a union drive. Whereas Terry's one-time comments did not cause any of the female hourly employees involved to consider the Jackson facility a hostile work environment [*See* Ex. H, p.2], Ewalt's behavior was considered by many of the hourly workers interviewed by Schollhammer and Mahoney to be a driving force behind their perceived need for third-party representation.

Ewalt has brought forth no additional evidence tending to show that Terry was treated differently than Ewalt, much less that such disparate treatment was on account of sex. For these reasons, Ewalt cannot proffer a *prima facie* case of gender discrimination, and therefore Acument's motion for summary judgment is **GRANTED** with respect to Count II.

III. Ewalt Cannot Show Acument's Legitimate, Nondiscriminatory Reasons For Terminating Her Employment Were Pretextual.

Assuming *arguendo* that Ewalt has made her required *prima facie* showings of FMLA and gender discrimination, Ewalt is unable to rebut Acument's legitimate, nondiscriminatory rationale for terminating her. Acument has alleged it terminated both Ewalt and Petitjean to stave off a union drive by the hourly workers at the Jackson facility. Ewalt has proffered no evidence that this motivation was a pretext to discriminate against her, either because of gender or because of her pending FMLA leave.

To satisfy the third prong of *McDonnell Douglas*, for both her FMLA and gender discrimination claims, Ewalt must show that Acument's proffered reasons for terminating Ewalt

14

were pretextual. The Sixth Circuit has laid out three ways Ewalt could make this required showing: 1) that the proffered reasons had no basis in fact; 2) that the proffered reasons did not actually motivate the discharge; or 3) that they were insufficient to motivate the discharge. *Manzer v. Diamond Shamrock Chemical Co.*, 29 F.3d 1078, 1084 (6th Cir. 2008).

Ewalt's argument instead centers around her disbelief of Acument's proffered motivation for terminating her. [Pl.'s Br., pp.9-12]. However, for purposes of establishing pretext, "it is not enough to *disbelieve* the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination." *Madden v. Chattanooga City Wide Serv. Dep't.*, 539 F.3d 666, 675 (6th Cir. 2008) (emphasis in original). Here, Ewalt proffers no objective facts through which to cast Acument's proffered reasons for terminating her in a pretextual light. Instead, Ewalt simply contends that Acument's reasons don't make sense. "[A] jury may draw an inference from untruthfulness from termination reasons that are relatively minor infractions, as they are here." [Pl.'s Br., p.9]. Such a showing is insufficient to show pretext with regard to either of Ewalt's causes of action.

Without objective evidence calling into question the pretextual nature of Acument's reasons for terminating her, Ewalt cannot satisfy the third prong of *McDonnell Douglas* on either of her causes of action. For this reason, even if Ewalt could make out *prima facie* cases supporting her FMLA and gender discrimination claims, summary judgment would still be proper.

CONCLUSION

For the reasons explained above, the Court **GRANTS** Acument's Motion for Summary Judgment [Document No. 15].

15

**IT IS SO ORDERED**.

          s/Sean F. Cox
          Sean F. Cox
          United States District Judge

Dated: April 23, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 23, 2009, by electronic and/or ordinary mail.

          s/Jennifer Hernandez
          Case Manager